CHAPIN FITZGERALD LLP
    Robert G. Knaier, Esq. (SBN: 234466)
    rknaier@cftriallawyers.com
550 West "C" Street, Suite 2000
San Diego, CA 92101
Tel: (619) 241-4810
Fax: (619) 955-5318

ANIMAL LEGAL DEFENSE FUND
    Carter J. Dillard, Esq. (SBN: 206276)
    cdillard@aldf.org
170 E. Cotati Way
Cotati, CA  94931
Tel: (707) 795-2533
Fax: (707) 795-7280

Attorneys for *Amicus Curiae*
Animal Legal Defense Fund

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| MAYFAIR HOUSE, INC., a California Corporation,<br><br>        Plaintiff,<br><br>v.<br><br>THE CITY OF WEST HOLLYWOOD, CALIFORNIA,<br><br>        Defendant. | Case No. 13-cv-07112 GHK (RZ)<br><br>Judge: Hon. George H. King<br><br>**ANIMAL LEGAL DEFENSE FUND'S MOTION FOR LEAVE TO FILE *AMICUS CURIAE* BRIEF IN SUPPORT OF DEFENDANT CITY OF WEST HOLLYWOOD, CALIFORNIA'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**<br><br>Time:  9:30 a.m.<br>Date:  January 13, 2014<br><br>Action Filed:  September 25, 2013 |

The Animal Legal Defense Fund (ALDF) respectfully requests leave to file an *amicus curiae* brief in the above-captioned case, in support of defendant City of West Hollywood's (City) Motion to Dismiss the First Amended Complaint and in opposition to plaintiff Mayfair House, Inc.'s (Mayfair House) request for a preliminary injunction.[1]  ALDF's proposed *amicus brief* is attached as Exhibit A. The City, through counsel, has consented to the filing of this brief.  *See* Declaration of Carter J. Dillard, Esq., filed herewith ("Dillard Dec."), ¶ 2.  To the extent that any arguments put forth by Mayfair House are not addressed in the *amicus* brief, ALDF concurs with and incorporates the City's arguments therein.

## I.  ARGUMENT

### A.  Standard for submission of *amicus curiae* brief.

A "district court has broad discretion to appoint amici curiae." *Hoptowit v. Ray*, 682 F.2d 1237, 1260 (9th Cir. 1982) *abrogated on other grounds by Sandin v. Conner,* 515 U.S. 472 (1995).  Indeed, "[g]enerally, courts have exercised great liberality in permitting an amicus curiae to file a brief in a pending case[.]" *In re Roxford Foods Litig.*, 790 F. Supp. 987, 997 (E.D. Cal. 1991) (quotation marks and citation omitted).  Amici "must merely make a showing that [its] participation is useful to or otherwise desirable to the court." *Id.*  Thus, "[d]istrict courts frequently welcome amicus briefs from non-parties concerning legal issues that have potential ramifications beyond the parties directly involved or if the amicus

---

[1] ALDF filed its initial motion for leave on November 15, 2013.  Subsequent to filing its motion for leave, however, ALDF became aware of Local Rule 7-3, requiring counsel to confer with opposing counsel at least seven days in advance of "the filing of any motion."  Accordingly, on November 27, 2013, and in compliance with Local Rule 7-3, counsel for ALDF conferred by telephone with counsel for Mayfair House.  *See* Declaration of Robert G. Knaier, Esq., filed herewith, ¶ 2.  The latter indicated that Mayfair House intends to oppose ALDF's motion.  *Id.*  ALDF thus filed this amended motion, renewing its request for leave to file an *amicus curiae* brief in support of the City's Motion to Dismiss the First Amended Complaint.

has unique information or perspective that can help the court[.]" *NGV Gaming, Ltd. v. Upstream Point Molate, LLC*, 355 F. Supp. 2d 1061, 1067 (N.D. Cal. 2005) (quotation marks and citation omitted).

### B. ALDF's participation will assist the Court because ALDF's expertise with respect to the impact of animal welfare legislation is unique.

On September 21, 2013, a City ordinance prohibiting the sale, import, export, trade, or distribution of fur products by "any means" anywhere in the City went into effect. *See* West Hollywood Municipal Code § 9.51.020(b) (2011). The City defined "fur" as "any animal skin or part thereof with hair, fleece, or fur fibers attached thereto, either in its raw or processed state, but shall not include such skins as are to be converted into leather or which in processing shall have the hair, fleece, or fur fiber completely removed"; and "fur product" as "any article of wearing apparel made in whole or in part of fur, excluding dog and cat fur[.]" *Id.* § 9.51.02(a)(1), (2).

For more than three decades, ALDF has been fighting to protect the lives and advance the interests of animals through the legal system. *See* Dillard Dec. ¶ 3. ALDF lobbies local and state municipalities nationwide for the enactment of animal welfare protection measures similar to those passed by the City, and it has seen the impact that local product bans can have on the alleviation of animal cruelty in those communities. *Id.* Founded in 1979 by attorneys active in shaping the emerging field of animal law, ALDF has blazed the trail for stronger enforcement of anti-cruelty laws and more humane treatment of animals in every corner of American life. *Id.* Today, ALDF's groundbreaking efforts to push the U.S. legal system to end the suffering of abused animals are supported by thousands of dedicated attorneys and more than 100,000 supporters, approximately 11,000 of whom reside in the Los Angeles, California area. *Id.*

ALDF's expertise in the areas of animal welfare legislation, state

preemption of cruelty laws, the scope of local police powers, and the impact these issues have on animal welfare generally is unique and specialized. *See* Dillard Dec. ¶ 4. ALDF will offer a perspective different from the City's because ALDF (1) understands the unique challenges local governments face when passing and enforcing animal cruelty laws; (2) has expertise in furthering animal protection legislation at the municipal level; and (3) is experienced in addressing constitutional questions that arise when animal welfare laws are under attack. *Id.* ALDF's expertise will undoubtedly prove helpful to the Court as it decides whether the City can regulate the sale of items derived from animal cruelty practices under the California Constitution and state law.

## II.   CONCLUSION

Therefore, ALDF respectfully requests leave to file the accompanying *amicus curiae* brief, in support of the City's Motion to Dismiss the First Amended Complaint, and in opposition to Mayfair House's request for a preliminary injunction.

Respectfully submitted,

DATED: December 4, 2013                    CHAPIN FITZGERALD LLP

By: /s/ Robert G. Knaier
    Robert G. Knaier, Esq.
    Attorneys for *Amicus Curiae*
    Animal Legal Defense Fund

# EXHIBIT A

CHAPIN FITZGERALD LLP
   Robert G. Knaier, Esq. (SBN: 234466)
   rknaier@cftriallawyers.com
550 West "C" Street, Suite 2000
San Diego, CA 92101
Tel: (619) 241-4810
Fax: (619) 955-5318

ANIMAL LEGAL DEFENSE FUND
   Carter J. Dillard, Esq. (SBN: 206276)
   cdillard@aldf.org
170 E. Cotati Way
Cotati, CA 94931
Tel: (707) 795-2533
Fax: (707) 795-7280

Attorneys for *Amicus Curiae*
Animal Legal Defense Fund

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| MAYFAIR HOUSE, INC., a California Corporation,<br><br>       Plaintiff,<br><br>v.<br><br>THE CITY OF WEST HOLLYWOOD, CALIFORNIA,<br><br>       Defendant. | Case No. 13-cv-07112 GHK (RZ)<br><br>Judge: Hon. George H. King<br><br>***AMICUS CURIAE* BRIEF OF THE ANIMAL LEGAL DEFENSE FUND IN SUPPORT OF DEFENDANT CITY OF WEST HOLLYWOOD, CALIFORNIA'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**<br><br>Time: 9:30 a.m.<br>Date: January 27, 2014<br><br>Action Filed: September 25, 2013 |

The Animal Legal Defense Fund (ALDF) files this *amicus curiae* brief in support of the City of West Hollywood's (City) prohibition on the sale, import, export, trade, and distribution of fur products within city limits.  Because state and federal laws protecting animal welfare are relatively narrow, animals depend on local governments to fill the animal protection void.  Indeed, local municipalities have broad, comprehensive police power over animals.  *See San Diego County Veterinary Med. Ass'n v. County of San Diego*, 116 Cal. App. 4th 1129, 1135 (2004).  The City has exhibited an extraordinary commitment to animal welfare protection in the past and serves as a beacon of leadership for local governments everywhere.  For the reasons described below, ALDF respectfully requests that the Court sustain the City's Motion to Dismiss the First Amended Complaint and deny plaintiff Mayfair House, Inc.'s (Mayfair House) request for a preliminary injunction enjoining enforcement of the City's ordinance.

## I.   FACTS AND BACKGROUND

Californians have become increasingly concerned with animal welfare issues.  For example, in 2004, the California Legislature enacted S.B. 1520, which banned the sale of diseased liver derived from the force feeding of ducks—or foie gras—within the state.  In 2008, California voters enacted Proposition 2, known as the Prevention of Farm Animal Cruelty Act, which requires farmers to provide animals with enough room to lie down, stand up, fully extend their limbs, and turnabout freely.  And in 2009, seven California cities banned the non-therapeutic declawing of domestic cats.  To date, each of these laws has been upheld as constitutional.

The City has been at the forefront of these efforts.  Indeed, for more than two decades, the City has routinely passed groundbreaking legislation in the area of animal welfare through its comprehensive police power over animals.  In 1989, the City passed Resolution Number 558 proclaiming the City a "Cruelty Free

Zone for Animals." City of West Hollywood Resolution 89-0558 (July 17, 1989). Affecting its policy that same year, the City banned steel leg-hold traps and animal testing of cosmetics within city limits. *Id.* Ten years ago, in 2003, the City banned the nontherapeutic declawing of animals within city limits—years before several other cities, noted above, followed suit. West Hollywood Municipal Code, tit. 9, art. IV § 9.49.020 (2003). Seven years later, the City prohibited the sale of dogs and cats within city limits. *Id.* § 9.50.020(b) (2010). And just this year, the City banned the commercial display of animals, which effectively prohibited circuses from profiting from the needless suffering of captive wild animals within city limits. Ryan Gierach, *WeHo Banning Circus Animal Performances*, WEHO NEWS, Sept. 16, 2013, http://wehonews.com/z/wehonews/archive/page.php?articleID=8208.

In November 2011, the City continued its efforts to promote animal welfare by prohibiting the sale, import, export, trade, or distribution of fur products by "any means" anywhere in the City. West Hollywood Municipal Code, tit. 9, art. IV § 9.51.020(b) (2011) (Ordinance). The Ordinance is carefully tailored and defines "fur" as "any animal skin or part thereof with hair, fleece, or fur fibers attached thereto, either in its raw or processed state, but shall not include such skins as are to be converted into leather or which in processing shall have the hair, fleece, or fur fiber completely removed." *Id.* § 9.51.02(a)(1). It further defines "fur product" as "any article of wearing apparel made in whole or in part of fur, excluding dog and cat fur[.]" *Id.* § 9.51.02(a)(2). To give its citizens and local businesses time to comply with the fur ban, the City postponed the effective date of the Ordinance to September 21, 2013. *Id.* § 9.51.020(b).

In justifying the Ordinance, the City found, among other things, "that animals that are slaughtered for their fur . . . endure tremendous suffering . . . typically spend[ing] their entire lives in cramped and filthy cages." Ordinance § 9.51.010(g). "Considering the wide array of alternatives for fashion and apparel

2

1 . . . the demand for fur products does not justify the unnecessary killing and cruel treatment of animals." *Id.* § 9.51.010(j). "The City Council believes that eliminating the sale of fur products will promote community awareness of animal welfare, and in turn, will foster a more humane environment in the City." *Id.* § 9.51.01(m). Appropriately, the City determined that allowing fur products to be sold in the City is inconsistent with the City's status as a "Cruelty Free Zone," so it passed the Ordinance. *Id.* § 9.51.010(l).

In passing the Ordinance, the City has eliminated profit as a motive for cruel treatment of farmed fur-bearing animals. Undoubtedly, fewer animals will suffer cruel and inhumane treatment as a result.

## II. ARGUMENT

Given the City's and ALDF's consistent and historic concern for animal welfare in California, this brief focuses on Mayfair House's misplaced contention that the City's Ordinance runs afoul of state constitutional and statutory provisions.[1] Because the Ordinance represents a valid exercise of municipal police power, does not conflict with state law, and only incidentally impacts state regulation of live game animals—if at all—it is constitutional and must be upheld.

**A. The City's prohibition on the sale, import, export, trade, and distribution of fur products is a valid exercise of its police power because it prevents the cruel treatment of animals.**

The California Constitution specifically allows a "city to make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws." CAL. CONST., art. XI, § 7. The California

---

[1] To the extent that the City's Motion to Dismiss addresses additional issues, such as the soundness of the Ordinance under federal law, ALDF concurs with the City's position on those issues.

3

1  Supreme Court has determined, however, that the Constitution imposes a
2  "limitation requiring local enactments not to conflict with the general welfare or
3  the public welfare." *Associated Home Builders, Inc. v. City of Livermore,* 18 Cal.
4  3d 582, 604 (1976).  The basic principle is that "a local land use ordinance falls
5  within the authority of the police power if it is reasonably related to the public
6  welfare." *Id.* at 607.  "If the validity [of the local ordinance is] fairly debatable,
7  the legislative judgment must be allowed to control." *Id.* at 605.  Moreover,
8  ordinances "are presumed to be constitutional, and come before the court with
9  every intendment in their favor." *Id.* at 604–05.

Limitations notwithstanding, municipal legislation exemplifies the "critical role municipal police power plays in the American system of government—to respond to new values, standards, and ideas as they develop locally, and thereby foster social and moral progress throughout the state and the nation as a whole." *Cal. Veterinary Med. Ass'n v. City of West Hollywood*, Amicus Curiae Brief of City and County of San Francisco in Support of Appellant, 2007 Cal. App. Ct. Briefs LEXIS 337, p. 9 (2007).  A municipality's ability to evolve in response to public opinion is enshrined in the California Constitution, where the founders, "recognizing that 'the municipality itself knew better what it wanted and needed than the state at large,'" codified the right of local autonomy "to emancipate municipal governments from the authority and control formerly exercised over them by the Legislature." *Id.* (citing *Johnson v. Bradley*, 4 Cal. 4th 389, 395-96 (1992)); *see also* CAL. CONST., art. XI, § 7.  In other words, the California Constitution contemplates local ordinances, like the City's, that "promote community awareness of animal welfare and foster a more humane environment in the city," so long as the ordinance does not conflict with the general welfare or public welfare.  Ordinance § 9.51.010(k).

The Ordinance is constitutional because it is reasonably tailored to address an issue squarely within its authority:  the prevention of animal cruelty.  *See Cal.*

4

*Veterinary Med. Ass'n v. City of West Hollywood*, 152 Cal. App. 4th 536, 562 (2007) (*CVMA v. West Hollywood*). In its findings, the City cites its desire to alleviate the suffering of animals, promote the general welfare within the City, and further its goal to maintain the City as a "Cruelty Free Zone" as justification for invoking its police powers. *See generally* Ordinance § 9.51.010. With the Ordinance, the City has effectively responded to evolving community concern for animal welfare by eliminating the profit incentive for cruel and inhumane treatment of farmed, fur-bearing animals without negatively impacting the general welfare or public welfare. To be sure, the Ordinance represents a valid measure of police powers. This Court should thus reject Mayfair House's unsupported attack on the City's constitutional autonomy and uphold the validity of the Ordinance.

**B. The Ordinance's prohibition on the sale of animal products is consistent with state regulation of wild, fur-bearing animals.**

Neither the California Constitution nor California state law retains exclusive authority to regulate products derived from fur-bearing animals. The Ordinance's prohibition on the sale of fur products derived from fur-bearing animals is consistent with state law and therefore constitutional.

**1. The Ordinance solely regulates *transactions in fur products*, which is distinct from the Legislature's vested authority to regulate live *game* animals, and therefore does not conflict with state law.**

The California Constitution establishes that "[t]he Legislature may provide for division of the State into fish and game districts and may protect fish and game in districts or parts of districts." CAL. CONST., art. IV, § 20 (Section 20). California enforces its constitutional mandate through the California Fish & Game Code, which regulates the methods by which hunters may take game from the wild. Cal. Fish & Game Code § 1, *et seq*. The meaning of "game" as used in

5

Section 20 proved a key question in *Young v. Dep't of Fish & Game*, 124 Cal. App. 3d 257 (1981). There, the court noted that the word "game" has "never been defined in the Fish and Game Code," but that it nevertheless has a plain meaning. *Id.* at 275. Citing Webster's International Dictionary, the Court found that "game" means "(a)nimals under pursuit or taken in hunting;" and similarly, citing to Funk and Wagnalls College Dictionary, "game" means "(c)ollectively, animals, birds or fish that are hunted or taken[.]" *Id.* at 274.

In contrast, the lone restriction established by the Ordinance pertains to transactions in fur products derived from a furbearing animal, long after that animal—or his or her forebear—was removed from the wild and could reasonably be considered game. Thus, the Ordinance and Section 20 address entirely different subjects: transactions in fur products and the protection of game, respectively. The City must be able to rely on the plain meaning of such common words as "game" when using its police power. And given the plain meaning of that term, it is not surprising that the City concluded its regulation of fur from animals other than dogs and cats is lawful.[2] Moreover, neither the California Constitution nor the California Fish & Game Code expressly prohibits local regulation of transactions in products derived from animal carcasses long after the animals were hunted. Therefore, the Ordinance is consistent with California law.

///
///
///

---

[2] The City knew about the distinction between fur products and game when it debated and enacted the Ordinance. As evidenced by the findings set forth in the Ordinance itself, the City carefully reviewed the status of fur product regulation at the state and federal level and concluded that it was free to regulate the sale of certain fur products. Ordinance § 9.519010(a)-(c). Indeed, the sale of dog and cat fur products was already illegal, so the City expressly excluded regulation of those products from its Ordinance. *Id.*

6

|     |     |
| --- | --- |
| 1   | **2. The California Fish and Game Code regulates the hunting** |
| 2   | **of wildlife, whereas the vast majority of fur products sold** |
| 3   | **in the United States are derived from "domestic animals"** |
| 4   | **or livestock.** |

According to the California Civil Code, "whenever *fur-bearing animals*, which are by their nature known as wild animals, have been brought into, or born in, restraint or captivity upon any farm or ranch for the purpose of cultivating or pelting their furs, such animals, together with their offspring or increase . . . *shall be considered and classified as domestic animals* for the purpose of and within the meaning of any statute or law relating generally to domestic animals." Cal. Civ. Code § 996 (emphases added). Mayfair House advances several California Fish & Game Code provisions which regulate the manner and method by which trappers may hunt or sell wild, fur-bearing animals as the bases for its preemption challenge. *See First Amended Complaint,* pp. 11-13. But the Ordinance regulates transactions in fur products derived overwhelmingly from domestic animals.

According to the World Society for the Protection of Animals, as cited by the City in its findings, fur farms produce eighty-five percent of fur in the world. Ordinance § 9.51.010(h). Indeed, the City cited the inhumane, cruel conditions of fur farms as the primary basis for the Ordinance: "On fur factory farms around the world, millions of raccoon dogs, rabbits, foxes, mink, chinchillas, and other animals spend their lives in wire cages, only to be killed by anal electrocution, by neck-breaking, or in gas chambers. Raccoon dogs have been documented to be skinned alive, and this type of fur is widely sold in the United States[.]" *Id.* § 9.51.010(i). Thus, the Ordinance overwhelmingly affects "domestic animals"—not wildlife—and does not conflict with California state law.

/ / /

/ / /

/ / /

### C. Even if the Court determines that the Ordinance affects "game," that effect is incidental, and thus constitutional.

Even if California law preempts the field of fish and game regulation as a general matter, local ordinances with a "valid principal purpose plainly within [a] city's police power" may have an "incidental" impact on game regulation without running afoul of the Constitution. *CVMA v. West Hollywood*, 152 Cal. App. 4th at 562; *see also People v. Mueller*, 8 Cal. App. 3d 949, 955 ("The effect of the challenged subsection . . . is incidental to the principal purpose of the legislation."). Indeed, local governments have "expansive constitutional police power authority" to act in the public interest to regulate animal welfare. *San Diego County Veterinary Med. Assn. v. County of San Diego*, 116 Cal. App. 4th 1129, 1135 (2004) (*SDVMA v. San Diego*) (upholding the county's authority to offer "wellness" vaccines). Employing this principal on numerous occasions, California courts have upheld local regulation of activities that have an incidental impact on an otherwise preempted field of law. *See CVMA v. West Hollywood*, 152 Cal. App. 4th at 551-52 (citing *SDVMA v. San Diego*, 116 Cal. App. 4th at 1135-36).

In *CVMA. v. West Hollywood*, the court upheld the City's ban on nontherapeutic declawing of animals because the ban had "a valid principal purpose plainly within the City's police power—the prevention of animal cruelty—and only a secondary or incidental effect on a field arguably preempted by the state." 152 Cal. App. 4th at 562. In *People v. Mueller*, the court held that a city's ban the use of live or dead fish bait within the city's harbor was, among other things, a valid pollution control measure. 8 Cal. App. 3d at 954-55. The court recognized that Section 20 and the California Fish & Game Code together preempted the field of fishing regulation, but ultimately, the city's ban on certain fishing methods had only an incidental impact on fishing and was therefore constitutional. *Id.* at 954. The California Attorney General similarly found that

8

1  the City of West Hollywood's ban on the use of steel leg-hold traps had only an
2  incidental impact on California's regulation of fish and game. 70 Cal. Op. Att'y
3  Gen. 210 (1989).
4        The City and ALDF acknowledge that a very small percentage of the fur
5  sold in the United States comes from wild-caught animals and that section
6  3039(b) of the Fish & Game Code protects a *trapper's* right to sell products
7  derived from *wild-caught animal* carcasses. But these facts do not transform the
8  Ordinance into wildlife regulation. Like the ordinances at issue in *CVMA v. West*
9  *Hollywood* and *Mueller*, the City's Ordinance only incidentally impacts
10 Californians who wish to hunt game within the state—if the Court can discern
11 any impact at all. It does not prevent Californians from hunting, trapping, or
12 otherwise killing fur-bearing animals. It simply prohibits, within city limits, the
13 sale of fur products derived overwhelmingly from *other* activities—*i.e.*, the cruel
14 and inhumane farming of fur-bearing animals.
15       Moreover, the long history of the City's and other municipalities' animal
16 welfare protection legislation highlights the extreme nature of Mayfair House's
17 argument on this point. If this Court carries Mayfair House's arguments to their
18 inevitable conclusion, local municipalities could not regulate animal cruelty at
19 all—because at least some of the victims of animal cruelty are wild, rather than
20 domestic animals. In addition, local municipalities could not regulate the sale of
21 other products derived from animals, such as milk; or the conditions under which
22 those products could be sold, such as farmers' markets. As explained above, this
23 is demonstrably not the law. In truth, the Ordinance's relationship to wildlife
24 regulation is tenuous at best. It is incidental, and therefore constitutional.

25                 **III.   CONCLUSION**
26       As Mahatma Ghandi explained: "The greatness of a nation and its moral
27 progress can be judged by the way its animals are treated." *CVMA. v. West*
28 *Hollywood*, 152 Cal. App. 4th at 541, n.1. This Court has been called upon to

1 | defend the right of local municipalities to embody such moral progress by
2 | promoting animal welfare.  ALDF respectfully asks the Court to protect this
3 | important right and dismiss Mayfair House's First Amended Complaint.
4 |                                       Respectfully submitted,
5 | DATED:   December 4, 2013             CHAPIN FITZGERALD LLP
6 |
7 |
8 |                                       By: /s/ Robert G. Knaier
9 |                                           Robert G. Knaier, Esq.
                                              Attorneys for *Amicus Curiae*
10|                                           Animal Legal Defense Fund

10